19-MJ-6518-MPK
19-MJ-6519-MPK

# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Special Agent Melissa Gillen, being duly sworn, depose and state that:

## Agent Background and Introduction

1. I am employed as a Special Agent with the Drug Enforcement Administration ("DEA"), where I have worked since April 2018. Since November 2018, I have been assigned to the New Bedford Resident Office of the New England Field Division of the DEA as a Special Agent. I am a graduate of the DEA Basic Agent Training Academy.

2. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3. Prior to joining the DEA, I was a Police Dispatcher/911 call taker in Montgomery County, Pennsylvania for approximately three years. In that position, I worked directly with, and dispatched for, more than fifty police departments. I was also responsible for answering 911 calls from the general public. In 2014, I received a bachelor's degree in Business Administration with a minor in Criminal Justice from West Chester University in West Chester, Pennsylvania. While in college, I completed two internships with the United States Postal Inspection Service in Philadelphia, Pennsylvania, where I worked in the narcotics and major crimes group assisting in various investigations regarding mailing of illegal narcotics. During those internships, I also participated in multiple controlled deliveries, package interdictions, as well as search and arrest warrants. In 2017, I received a Master of Business Administration from Pennsylvania State University.

4. As a Special Agent with the DEA, I have participated in numerous drug investigations resulting in the criminal charges, arrests, seizures of narcotics, seizure of assets and subsequent convictions for narcotic violations. Through such training and experience, I have developed a working knowledge and understanding with the ways illicit drugs including heroin, fentanyl, cocaine, and other controlled substances, are packaged, priced, and distributed. Furthermore, I am familiar with the paraphernalia associated with certain drugs and the street terminology used in their classification.

5. I have received training regarding narcotics investigations, drug identifications, confidential source handling, and surveillance techniques while attending the Basic Agent Training Academy.

6. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. During federal investigations, I have also reviewed recorded conversations and telephone, financial, and drug records.

7. Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement. I am also familiar with the terminology and slang commonly employed by drug traffickers. In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, heroin, fentanyl, and other controlled substances that are, by themselves, illegal to possess. I am aware of the prices commonly charged

on the street for these substances, the method of packaging, and the jargon used in their trade. I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

8.  Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses." I also am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, and other means to facilitate their illegal activities.

### Purpose of the Affidavit

9.  I submit this affidavit in support of an application for a criminal complaint alleging that on October 2, 2019, Isaiah RIEVES a/k/a "Unk" ("RIEVES" or "Target Subject") distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vi).

10. I also submit this affidavit in support of an application for a search warrant for the following target location, which is described in greater detail below and in Attachment A and B, and which is believed to be the residence of RIEVES:

      a.    75 Seymour Avenue, Lynn, Massachusetts ("Target Location").

11.    Based on the facts set forth in this affidavit, there is probable cause to believe that RIEVES has violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi) (distribution of 40 grams or more of fentanyl and other controlled substances) (the "Target Offense") and that evidence of the Target Offense, as set forth in Attachment B, will be found inside the Target Location.

12.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the requested complaint and warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

A.  Target Offense

13.    The DEA New Bedford Resident Office has been engaged in an investigation into the drug distribution activities of RIEVES since October 2019.

14.    In August 2019, investigators conducted two controlled purchases of controlled substances (lab-confirmed fentanyl pills on the first occasion, and then suspected fentanyl pills, heroin/fentanyl powder, and cocaine on the second occasion) from an individual who later began cooperating with investigators ("CS").

15.    On September 19, 2019, this Court authorized a search warrant for CS's residence. On October 1, 2019, investigators executed that search warrant and located approximately 2,447 grams of suspected fentanyl, 716 grams of suspected benzodiazepine pills, 176 grams of suspected gabapentin, 623 grams of suspected cocaine, 469 grams of suspected Adderall pills, 269 grams of suspected ecstasy, 291 grams of suspected methamphetamine, 70 grams of Suboxone Strips, 33

grams of suspected acid, 66 grams of suspected fentanyl pills, and 971 grams of miscellaneous cutting agents. All of these substances have been sent to the DEA Northeast Regional Laboratory for analysis, and the results are pending.

16. CS immediately agreed to cooperate and—after waiving his/her Miranda rights—admitted that the drugs found in his/her apartment belonged to him/her. He/she provided information about the individual from whom he/she purchased the drugs. CS stated that CS originally met his/her supplier, a black male, known as "Unk/Unc," approximately one and a half years ago. CS stated that "Unk" lives in Lynn, Massachusetts and drives a gold Chevy Tahoe (the "RIEVES Tahoe"), as well as a motorcycle. CS stated that he/she communicated with "Unk" via text message, and typically bought heroin, Percocet, benzodiazepine, ecstasy, gabapentin, cocaine, and/or Adderall from "Unk." CS also stated that "Unk" typically "fronts" CS the drugs, and then CS pays "Unk" back at a later date. CS provided the telephone number for "Unk" as 208-781-8233 ("RIEVES Phone"). As detailed below, investigators later identified the person CS knew as "Unk" to be RIEVES.

17. On October 2, 2019, at the direction and under the supervision of investigators, CS contacted RIEVES via the RIEVES Phone and stated that CS needed to re-up and wanted to know if RIEVES was available that same day. RIEVES told CS he was available "around 7ish" and would let CS know when he was in the area. CS and RIEVES agreed on a meeting location familiar to CS. Investigators searched CS and CS's vehicle with negative results, and provided CS with an audio transmitting and recording device. At approximately 7:45 p.m., CS received a text message from REIVES Phone stating that he was en route to meet the CS.

18. At approximately 9:26 p.m., investigators observed the RIEVES Tahoe, which was being driven by a black male later determined to be RIEVES, arrive and park near the prearranged meeting location. RIEVES was alone in the RIEVES Tahoe. At approximately 9:29 p.m., CS received a text message from RIEVES Phone stating that he had arrived. CS entered his/her own vehicle and traveled to meet RIEVES, while being followed by investigators. At approximately 9:38 p.m., CS parked his/her own vehicle near the RIEVES Tahoe, exited his/her own vehicle, and entered the front passenger seat of the RIEVES Tahoe. While CS was inside the RIEVES Tahoe, RIEVES advised CS to get a new telephone, and told CS that he had a new telephone number: 339-440-2390 ("RIEVES Phone 2").

19. At approximately 9:53 p.m., CS exited the RIEVES Tahoe and retrieved a box from the back of the RIEVES Tahoe, which CS carried to his/her own vehicle. CS then drove his/her vehicle—while under surveillance—directly to meet with investigators. Inside the box CS received from RIEVES, investigators located numerous types of pills and other powder/rock substances, all believed to be controlled substances, including: an orange prescription-type bottle containing red rectangular pills believed, based on their color, shape, and size, to be ecstasy pills; a clear knotted bag containing a white rock-like substance believed, based on its color and appearance, to be cocaine; a clear plastic bag containing orange pills with "30" and "AD" imprinted on them believed, based on their color, shape, and size, to be Adderall; a sealed vacuum bag containing a white rock-like substance believed, based on its color and appearance, to be cocaine; a clear bag with "500" written on the outside of the bag, containing blue pills with "K9" imprinted believed, based on their color, shape, and size, to be fentanyl pills; a sealed vacuum bag containing a tan rock-like substance believed, based on its color and appearance, to be fentanyl; 5

separate black boxes marked "Liquid Gold Pods," further containing 10 smaller boxes, believed, based on the markings on the box, to be THC pods. All of these substances were sent to the DEA Northeast Regional Laboratory for analysis. The results for the blue pills marked K9 came back positive for 61.18 grams of fentanyl, and the results for the tan rock like substance came back positive for 247.3 grams of fentanyl. The remaining results are pending.

20. Meanwhile, other investigators followed the RIEVES Tahoe as it traveled back up to Lynn, Massachusetts. At approximately 10:39 p.m., state investigators executed a traffic stop of the RIEVES Tahoe and the driver presented a Massachusetts driver's license in the name of Isaiah RIEVES, with an address of the Target Location (75 Seymour Avenue, Lynn, Massachusetts). Following the traffic stop, investigators continued surveillance of the RIEVES Tahoe as it traveled to the Target Location, where RIEVES exited the RIEVES Tahoe and walked toward the Target Location.

21. On October 22, 2019, RIEVES contacted CS via RIEVES Phone 2 requesting payment for the controlled substances delivered on October 2, 2019. Under the direction and supervision of investigators, CS told RIEVES he could provide partial payment, but did not have the full payment. On the evening of October 22, 2019, GPS data revealed that RIEVES traveled from Lynn, Massachusetts to the CS's home, and then to his/her parents' home. Investigators conducting surveillance outside of CS's parents' home observed RIEVES drive the RIEVES Tahoe past the home several times before parking outside and shutting off the headlights. RIEVES then attempted to contact CS several times, before RIEVES left the area and traveled back to the Target Location. Later that night, RIEVES contacted CS and told him/her that he was going to come back on the evening of October 23, 2019, to collect payment.

22. Based on the foregoing, there is probable cause to believe RIEVES distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B)(vi).

B. <u>Target Location</u>

*Drug Traffickers' Use of Residences and Stash Houses Generally*

23. Based on my training and experience, including participation in other narcotics investigations and extensive discussions with other law enforcement officials experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences and/or "stash" or "staging" locations ("storage locations"). I have participated in the execution of numerous search warrants of the residences and/or storage locations of drug traffickers whose criminal activity is similar to that of the Target Subject. In a substantial number of these searches executed in connection with the drugs investigations in which I have been involved, drug related evidence has typically been recovered, including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

    i.    Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residences or storage locations in order to maintain and finance their ongoing business;

    ii.    Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation,

ordering, sale and distribution of controlled substances, and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passport and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other storage locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficker business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences or storage locations for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

iii. It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement officials;

iv. It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement officials;

v. Drug traffickers commonly maintain electronic and paper book or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where

        the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

    vi.    Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

    vii.    Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

    viii.    Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

    ix.    Drug traffickers frequently possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs;

    x.    Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

24. Based on all of the evidence I have obtained in the course of this investigation, and for the reasons more specifically set forth herein, I believe the Target Subject, like many drug traffickers, uses his residences in furtherance of his ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachment B, will be found in the Target Location. *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even

19-MJ-6518-MPK
19-MJ-6519-MPK

*Description and Criminal Activity at Target Location*

25.     The residence at 75 Seymour Avenue, Lynn, Massachusetts (the Target Location) is a two-story, single-family house. The house and its yard are enclosed by a fence. The front door is accessed via several stairs. The number "75" is printed in dark lettering on the top stair before the front door.

26.     As set forth above, in paragraph 20, RIEVES' driver's license lists his residence as the Target Location, and investigators observed RIEVES return to the Target Location after delivering the box of fentanyl and other controlled substances to CS on October 2, 2019.

27.     Further, on October 8, 2019, the Court authorized investigators to use a real-time Global Positioning System ("GPS") on the RIEVES Tahoe (19-MJ-6450-MPK). Investigators installed the GPS device on October 10, 2019. GPS data from this device reveals that the RIEVES Tahoe has been parked outside of the Target Location every night since the GPS device was installed, including as recently as October 22, 2019. Additionally, in that same time period, investigators have physically observed RIEVES driving the RIEVES Tahoe to/from the Target Location, and have seen RIEVES entering the Target Location. Based on the above, I believe the Target Location is RIEVES' residence.

28.     Based on my training and experience, and the information set out above, I believe the Target Subject, like many drug traffickers, uses his residence at the Target Location in furtherance of his ongoing drug-trafficking activities, and that, among other things, drug proceeds,

---

longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale)). As the First Circuit has explained, "[b]y it's very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

Case 1:19-mj-06518-MPK   Document 4-1   Filed 10/23/19   Page 12 of 15

19-MJ-6518-MPK
19-MJ-6519-MPK

ledgers detailing drug transactions and drug debts, customers lists, telephones used to conduct drug transactions, and other evidence of ongoing drug trafficking activities, as set forth in Attachment B, are likely to be stored at the Target Location.

*Basis for Seizure and Search of Cellular Telephones*

29.     In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular telephones at the same time, as well as prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Indeed, throughout this investigation, the Target Subject has used cellular telephones to communicate about and further his drug trafficking activities and has changed his telephone numbers.

30.     This request to seize and search cellular telephones includes "smartphones," i.e. those cellular telephones that are capable of serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

31.     A cellular telephone is a handheld wireless device used for voice and text communications, as well as for accessing the internet.  Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which

records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities, including but not limited to, storing names and phone number in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include GPS technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in order to further prevent detection, and often use text messages in lieu of telephone calls to avoid speaking over the telephone.

32. Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files stored on cellular telephones (and particularly smartphones) can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    i. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their cellular telephones, they can easily transfer the data from their old cellular telephone to their new cellular telephone;

    ii. Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might

      not occur for long periods of time. In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file;

  iii.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

33. Based on my knowledge and training, and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a cellular telephone, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the cellular telephone be seized and processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because:

  i.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site; and

  ii.  Analyzing cellular telephones is a highly technical process requiring expertise and a properly-controlled environment. It is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Consequently, law enforcement agents may either copy the data at the premises to be searched, or seize the computer equipment for subsequent processing elsewhere. This application seeks permission to search and seize cellular telephones either onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

## **CONCLUSION**

34. Based on the information set forth above, I believe probable cause exists to conclude that on October 2, 2019, the Target Subject distributed 40 grams or more of fentanyl, and other controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and

19-MJ-6518-MPK<br>19-MJ-6519-MPK

(b)(1)(B)(vi), and further, that evidence of the Target Offense, as set forth in Attachment B, will be found inside the Target Location.

I declare that the foregoing is true and correct.

_____
Melissa Gillen
Drug Enforcement Administration

Subscribed and sworn to before me on October __23__, 2019

_____
Hon. M. Page Kelley
United States Magistrate Judge